# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 21-1802V

* * * * * * * * * * * * * * * * * * * * * * * *
|  |  |
TERESA AULTMAN,                           Chief Special Master Corcoran

        Petitioner,                Filed:  July 11, 2025

      v.

SECRETARY OF HEALTH AND
HUMAN SERVICES

        Respondent.

* * * * * * * * * * * * * * * * * * * * * * * *

*M. Clay Ragsdale, IV*, Ragsdale LLC, Birmingham, AL, for Petitioner.

*Alexa Roggenkamp*, U.S. Department of Justice, Washington, DC, for Respondent.

## ENTITLEMENT DECISION[1]

On September 3, 2021, Teresa Aultman filed a petition for compensation under the National Vaccine Injury Compensation Program (the "Vaccine Program").[2] Petition (ECF No. 1) ("Pet."). Petitioner initially alleged that as a result of Measles, Mumps, and Rubella ("MMR") and/or influenza ("flu") vaccines received on October 1, 2018, she developed "chronic, disabling reactive arthritis and Sjogren's Syndrome." *See* Pet. at 1. She has since refined her claim to allege as her injury a form of inflammatory polyarthropathy that could be understood to be seronegative rheumatoid arthritis ("RA").

I determined that the matter could be appropriately resolved by ruling on the record, and set a briefing schedule on the issue of entitlement. *See* Scheduling Order, dated Jan. 30, 2024. The parties have offered briefs in support of their respective positions. Petitioner's Brief, dated Sept.

---

[1] Under Vaccine Rule 18(b), each party has fourteen (14) days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public in its present form. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3758, codified as amended at 42 U.S.C. §§ 300aa-10 through 34 (2012) [hereinafter "Vaccine Act" or "the Act"]. Individual section references hereafter will be to § 300aa of the Act (but will omit that statutory prefix).

13, 2024 (ECF No. 41) ("Br."); Respondent's Brief, dated Oct. 24, 2024 (ECF No. 43) ("Opp."); Petitioner's Reply, dated Dec. 6, 2024 (ECF No. 46) ("Reply"). Now, for the reasons set forth below, I deny entitlement. The general injury alleged by Petitioner is not preponderantly supported by the record, and she has not otherwise shown that the vaccines she received could have caused a reaction that lasted more than six months, or otherwise evolved into her later presentation—even if they *did* cause an immediate but transitory reaction.

## I.    Fact Summary

*Vaccination and Initial Reaction*

Prior to vaccination, Petitioner had a medical history that included a wide variety of concerns (e.g., insomnia, attention deficit hyperactivity disorder, dysthymia, Meniere's Disease, and obesity). Ex. 8 at 187–88. Most relevant herein, however, was the extent to which she had previously experienced eczema. *See* Ex. 8 at 182, 187, 191, 195.

On October 1, 2018, Ms. Aultman (then 47 years old) received the flu and MMR vaccines at the Employee Health Services ("EHS") division of University of Alabama-Birmingham ("UAB") Hospital in Birmingham, Alabama, where she worked as a research nurse coordinator. Ex. 1 at 6. There is no direct medical record evidence of any immediate post-vaccination reaction (although a later VAERS[3] report filed by Petitioner on October 10, 2018, maintains that she began experiencing a reaction on October 3, 2018). *Id.* at 2.

Approximately one week after receiving the vaccines at issue (October 8, 2018), Petitioner returned to EHS, complaining of a reaction to the vaccinations on her limbs, back, and neck, with associated itching. *Id.* at 2. She also noted that she had been attempting to treat the reaction at home with antihistamines, but that she had begun to have trouble breathing, and therefore was advised by EHS treaters to seek emergency care. *Id.*

At the emergency department, Petitioner was assessed with having experienced a possible allergic reaction to her October 1st vaccines. Ex. 4 at 140, 146. She specifically reported having broken out in a rash after their receipt. *Id.* at 146. Exam revealed a moderate, itchy rash in the complained-of areas mentioned above, with some evidence of plaques. *Id.* at 147. An examining treater deemed it unusual for Petitioner to still be experiencing an allergic reaction from an event a week ago, but started Petitioner on a course of oral steroids, administered a cortisone injection in her left hip, and discharged her that day. *Id.* (Two days later, Petitioner filed the aforementioned VAERS report, with the assistance of EHS). *See* Ex. 1 at 2.

---

[3] VAERS is the Vaccine Adverse Event Reporting System, a database maintained by the Centers for Disease Control. VAERS collects information about adverse events that occur after the administration of licensed vaccines in the U.S. *See About VAERS*, Vaccine Adverse Event Reporting System (VAERS), https://vaers.hhs.gov/about/index (last visited July 11, 2025).

That October, Petitioner continued to seek treatment for her alleged vaccine reaction. In the middle of the month, she went to a physical medicine clinic. Ex. 4 at 166–68. She informed treaters that the rash had mostly resolved, but that she was experiencing headaches (which were causing nausea and vomiting) and joint pain that was unresponsive to over-the-counter medicines. *Id.* She also stated that her reaction had led to facial swelling and shortness of breath after the vaccinations, although these symptoms had subsided. *Id.* (Importantly, there is no record evidence corroborating the allegation of post-vaccination facial swelling).

An exam revealed trace edema at both ankles. Ex. 4 at 167. At a follow-up visit later in October, Petitioner again displayed a rash on her face, limbs, and chest and reported ongoing hip and knee pain, although she noted no more headaches, and that the rash had improved. *Id.* at 171. Petitioner was assessed with having some form of Type III allergic reaction, and the physician prepared a letter advising her against receipt of these vaccines again. Ex. 1 at 10, 11.

*Progression of Symptoms*

During the remainder of 2018, Petitioner continued to seek treatment for a host of symptoms. On November 8, 2018, for example, she had an urgent care visit at UAB for left-sided sciatica/back pain, radiating into her foot. Ex. 4 at 35. A treater proposed the possibility that she had shingles, prescribing (among other things) an antiviral specific for its treatment. *Id.* In the middle of November, she returned to the same physical medicine clinic she had visited in October, and also a UAB clinic. *Id.* at 86, 183. She reported more left hip pain, foot numbness, and a rash (although it was deemed inconsistent with shingles). *Id.* at 86, 89. (Her exam also revealed slowed speech and diminished lumbar range of motion. *Id.* at 185). A treater deemed the radiculopathy symptoms Petitioner was displaying to be inconsistent with a vaccine reaction. *Id.* at 61. Ms. Aultman ultimately completed six physical therapy sessions for back pain through December 2018 at UAB. Ex. 4 at 76, 175.

At the end of November 2018, Petitioner was seen on referral by Dr. Njeri Maina at the Alabama Asthma and Allergy Center. Ex. 5 at 5–6. After review of her records and history, Dr. Maina opined that Petitioner's symptoms were consisted with a "delayed Type III reaction caused by influenza, MMR, or a combination of both vaccines." *Id.* at 20. Petitioner was prescribed medication for treatment of reactive arthritis, among other things. Ms. Aultman saw Dr. Maina again on December 14, 2018, and reactive arthritis remained a diagnosis (although by this point, she was no longer experiencing a rash). *Id.* at 13–14. Petitioner's ongoing hip/lumbar pain also resulted in another emergency treatment visit on December 11, 2018. Ex. 6 at 15. And a lumbar MRI she underwent later that month revealed a right paracentral protruding disc contacting the S1 nerve root at L5-S1. Ex. 4 at 115. Petitioner was subsequently diagnosed by an orthopedist on December 20, 2018, with lumbar radiculopathy and left hip bursitis, and received an epidural steroid injection the next day. Ex. 34 at 201, 204.

*2019 Treatment*

Although Petitioner received a great deal of treatment into 2019 for symptoms that she alleges are associated with her prior vaccinations, the records provide limited illumination as to possible etiologic bases for her concerns.

Throughout the first half of 2019, for example, Petitioner received treatment from a neurosurgical clinic for her back and leg pain complaints. Ex. 7 at 62, 73. In particular, in March 2019 she underwent a minimally-invasive surgical procedure used to relieve pressure on spinal nerves—something often performed in the course of treating cervical radiculopathies. *Id.* at 13. In fact, the treaters she saw for this procedure deemed her to have likely experienced a radiculopathy attributable to "degenerative changes." *Id.* at 75. Petitioner had a number of PT sessions after this procedure. Ex. 13 at 36, 54. Petitioner also saw an orthopedist over roughly the same timeframe, with a focus on complaints about her left ankle. Ex. 11 at 2. In the course of receiving such orthopedic treatment, she was diagnosed with osteoarthritis of the left ankle and foot, and rheumatoid polyneuropathy with rheumatoid arthritis ("RA") of the left ankle and foot, and treated with a brace and a home exercise regimen. *Id.* at 4, 10.

In addition, Ms. Aultman received neurologic-oriented treatment. In mid-January 2019, Petitioner underwent a brain MRI as part of an effort to evaluate the nature of her complaints (and headaches in particular). Ex. 8 at 104. At most, some evidence of mild nonspecific white matter disease was seen, along with signs of progression since an MRI performed five years before (and thus pre-vaccination). Ex. 9 at 340. She also underwent a neurologic consult in February 2019. Ex 10 at 22. While the treater again repeated prior conclusions (likely derived from Petitioner's medical history) that she had experienced some kind of vaccine reaction, testing and additional imaging yielded no evidence of a neurologically-driven disease (although Petitioner was prescribed medication specific to treatment of nerve pain and headaches). *Id.* at 11, 25.

Other treaters, however, began to note some discrepancies between the possibility that Petitioner had experienced an immune-mediated vaccine reaction and their own findings. For example, a primary care provider speculated in January 2019 (after hearing of Petitioner's continued complaints of leg and right hip pain) that the etiology of her symptoms might be autoimmune rather than evidence of reactive arthritis. Ex. 8 at 103. But blood serum testing not only revealed no evidence of any inflammatory biomarkers, but also was negative for common rheumatoid-oriented conditions, like lupus or RA. *Id.* at 96–98. Imaging obtained that winter was, by contrast, positive for arthritis or osteoarthritis. *Id.* at 83–84.

Ms. Aultman specifically visited a rheumatologist, Dr. Thao Tran, in early March 2019 and reported joint swelling and back pain. Ex. 8 at 129. She had received orthopedic treatment at the end of that February for left calf and ankle swelling, and was sent to Dr. Tran "to rule out

inflammatory arthritis." *Id.* She also recounted a history of joint swelling (although noted that it had resolved, along with her rash the year before). *Id.* at 129, 131. Dr. Tran, however, only saw evidence of *degenerative* arthritis, as opposed to the presence of an inflammatory arthritis process. *Id.* at 131 (indicating "no evidence of synovitis [inflammation/swelling]," and deeming any risk of rheumatic process "low at this point"). And Petitioner did not test positive for rheumatoid factor or any inflammatory biomarkers. *Id.* at 133.

Petitioner later received a somewhat different diagnosis from a second rheumatologist. In May 2019, Ms. Aultman was evaluated by rheumatologist Dr. Greg Eudy for possible reactive arthritis. Ex. 12 at 4. The history Dr. Eudy received from Petitioner was consistent with what she had told other treaters: that she had been in normal health until two days post-vaccination, at which point she developed a full body rash, joint pain, and swelling. *Id.* Dr. Eudy's exam revealed that Petitioner was experiencing pain in her thighs and arms and swelling in her fingers, knees, and ankles. *Id.* Testing revealed borderline-normal levels of antinuclear antibodies (associated with RA) and a high-normal inflammation biomarker, as well as somewhat elevated levels of white blood cells. Ex. 34 at 47. Dr. Eudy offered the diagnosis of inflammatory polyarthropathy, with "sudden onset after MMR and flu vaccines," and associated fatigue and rash. Ex. 12 at 6. He also proposed that the condition was likely vaccine-triggered (while expressing the caveat that "I was hoping serology testing would help [diagnostically], but it did not"). Ex. 48 at 12.

Ms. Aultman continued to see Dr. Eudy thereafter. She visited him a second time in June 2020, at which time swelling in her ankles was observed. Ex. 12 at 7. She complained of mostly joint pain in the following month, and again displayed swelling in unspecified locations. *Id.* at 10. By September, Dr. Eudy was diagnosing Petitioner (who now reported rash recurrence plus morning stiffness) with "negative RF/RA of multiple Sites," and Dr. Eudy began her on monthly infusions of an RA-oriented medication (Orencia). Ex. 8 at 116, 118. She saw Dr. Eudy in the ensuing time on a regular basis (approximately every three months) through the present date, receiving Orencia through October 2022 (and additional different medications since then). Ex. 37 at 3; Ex. 48 at 151.

*Treatment for Other Symptoms*

Although the filed medical records mostly involve efforts by Ms. Aultman to treat her rheumatic-like symptoms, she also received medical care for other concerns which bear somewhat on the nature of the injury Petitioner claims to have experienced.

For example, there is record evidence that Petitioner obtained treatment relating to her eyes on several occasions. On June 10, 2019, she was evaluated at Callahan Eye Foundation for dry and

red eyes. Ex. 15 at 3. She received thereafter a diagnosis of bilateral Sjogren's Disease[4] on July 9th, 2019. *Id.* at 15. Less than a year later (in March 2020), Petitioner obtained an eye specialist evaluation for a medication used for an immunosuppressive drug. Ex. 21 at 8. She continued to see treaters for dry eyes, and has used a medication aimed at resolving that condition. *Id.* at 14.

Petitioner also continued to obtain orthopedic care. In July 2019, Ms. Aultman was treated for pain in her left lower leg and ankle by Dr. Mark Elkus at Orthopedic Group of Birmingham, and an MRI suggested the presence of left ankle tenosynovitis. Ex. 17 at 18, 95. She later complained of knee pain that month, and it was recommended she engage in physical therapy for its treatment, which she pursued that August. *Id.* at 15; Ex. 13 at 7, 20. She saw Dr. Elkus again in 2021 for knee and hip pain complaints, and eventually underwent surgery on her left hip. Ex. 17 at 114.

In early 2020, Petitioner obtained dermatologic treatment (specifically a skin biopsy for her facial rash). Ex. 18 at 5. That fall, she saw a podiatrist for foot pain. Ex. 14 at 4. She also saw a gastroenterologist in November 2020 for gastritis characterized as erosive gastritis, and it was later proposed by her primary care doctor that anti-inflammatory medications she had been receiving for her rheumatic-like symptoms had possibly caused the gastritis. Ex. 16 at 5; Ex. 8 at 420. But once Petitioner ceased these medications, she experienced an increase in knee and hip pain. Ex. 8 at 420.

## II. Expert Opinions

### A. *Petitioner's Experts*

1. <u>Dr. Chander Raman, Ph.D.</u> — Dr. Raman, an immunologist, prepared three written reports on Petitioner's behalf. Report, dated Feb. 28, 2023, filed as Ex. 32 (ECF No. 20-1) ("First Raman Rep."); Report, dated Jan. 16, 2024, filed as Ex. 39 (ECF No. 29-1) ("Second Raman Rep."); Report, dated July 28, 2024, filed as Ex. 59 (ECF No. 38-10) ("Third Raman Rep.").

Dr. Raman is a professor of dermatology and microbiology at the University of Alabama at Birmingham. *See* Curriculum Vitae, filed as Ex. 33 (ECF No. 20-2) ("Raman CV") at 2. He received his Ph.D. in microbiology from Southern Illinois University before completing post-doctoral research at the Loyola University Chicago Stritch School of Medicine. *Id.* Until 2020, he was a professor of medicine in the University of Alabama Department of Medicine Division of

---

[4] "Sjogren syndrome" is "a symptom complex of unknown etiology, usually occurring in middle-aged or older women, marked by the triad of keratoconjunctivitis sicca with or without lacrimal gland enlargement, xerostomia with or without salivary gland enlargement, and the presence of a connective tissue disease, usually rheumatoid arthritis but sometimes systemic lupus erythematosus, scleroderma, or polymyositis. An abnormal immune response has been implicated. *Sjogren syndrome*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=111409 (last visited July 11, 2025).

Clinical Immunology and Rheumatology. *Id.* at 3. Dr. Raman holds multiple appointments at medical research centers at Alabama. *Id.* His research focuses on the "study of underlying mechanisms of abhorrent/dysregulated immune activation leading to acute and chronic inflammation observed in autoimmune diseases, with specific interest in multiple sclerosis ("MS"), rheumatoid arthritis and systemic lupus erythematosus." First Raman Rep. at 2. Dr. Raman has authored or co-authored more than 80 papers in peer-reviewed publications and evaluates autoimmunity research grant applications for the National Institute of Health ("NIH"). *Id.*; Raman CV at 19–28.

*First Report*

After a recitation of his credentials and a short overview of Petitioner's relevant medical history, Dr. Raman opined that the MMR and flu vaccines she received could have caused her illnesses, and did so in fact. First Raman Rep. at 4–6. He began by attempting to characterize the nature of her injury, which he generally attributed to a "severe allergic reaction" to the vaccines administered on October 1, 2018, that in turn later resulted in symptoms of a different kind. *Id.* at 4.

In particular, Dr. Raman contended that Ms. Aultman had specifically experienced a "type III hypersensitivity" reaction. First Raman Rep. at 4. Such a reaction is the product of "the formation of immune complexes between pre-existing antibodies and antigen present in the vaccines. *Id.* at 11; N. Usman & P. Annamaraju, *Type III Hypersensitivity Reaction*, in StatPearls (2023), filed as Ex. 24 (ECF No. 19-1) ("Usman & Annamaraju"). This in turn initiates "a sequence of activity beginning with deposition of complement and activation of the complement cascade," recruiting immune cells in a way that produces excessive inflammation capable of causing tissue and vascular damage. First Raman Rep. at 5. The clinical manifestations of a hypersensitivity reaction include rash and itching and erythema,[5] and will usually manifest within a few days of exposure to the triggering antigen. *Id.*

Vaccines are understood in some cases to prompt such a hypersensitivity reaction, especially in those with a predisposition for excessive inflammation. First Raman Rep. at 5–6. One study demonstrated that possession of an "innate epigenetic signature" was associated with a robust vaccine response, likely involving high levels of inflammation. *See* S. Fourati et al., *Pan-vaccine Analysis Reveals Innate Immune Endotypes Predictive of Antibody Response to Vaccination*, 23 Nature Immunology 1777, 1777–1787 (2022), filed as Ex. 28 (ECF No. 19-5). In fact, the immune system (and the innate, initial response in particular) could become "trained" to react to vaccination—beneficial to the extent the reaction increased the vaccine's efficacy, but with

---

[5] "Erythema" is defined as "redness of the skin produced by congestion of the capillaries." *Erythema*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=17187&searchterm=erythema (last visited July 11, 2025).

the potential to "aggravate subclinical/quiescent disease such as to allergens." First Raman Rep. at 6; M. Netea et al., *Defining Trained Immunity and its Role in Health and Disease*, 20 Nature Review Immunology 375, 375–76 (2020), filed as Ex. 30 (ECF No. 19-7) ("Netea"); L. Wanka & U. Jappe, *Trained Immunity and Allergy: State of the Art and Future Perspectives*, 76 Allergy 1265, 1265–67 (2021), filed as Ex. 31 (ECF No. 19-8).

Accordingly, Dr. Raman deemed it likely that an initial allergic response to vaccination could in some cases prompt conditions that would encourage other autoimmune-driven diseases. First Raman Rep. at 6 ("I would predict that an inverse situation where exaggerated inflammation as in type III hypersensitivity serves to trigger and activate a quiescent adaptive immune system and resulting pathogenic autoimmunity"). A number of autoimmune diseases or conditions comparable to what Petitioner experienced (Sjogren's, RA, reactive arthritis) were understood to be "significantly influenced by environmental risk factors"—and such externalities could actually significantly influence the "course and outcomes" for these conditions. *Id.* at 5; J. Tarn et al., *Symptom-based Stratification of Patients with Primary Sjögren's Syndrome*, 1 The Lancet Rheumatology e85, e85–e94 (2019), filed as Ex. 27 (ECF No. 19-4); P. Soret et al., *A New Molecular Classification to Drive Precision Treatment Strategies in Primary Sjögren's Syndrome*, 12 Nature communications 3523 (2021), filed as Ex. 26 (ECF No. 19-3).

Dr. Raman identified record evidence consistent with his conclusion that Petitioner likely experienced an immediate hypersensitivity reaction. The timing was what would be expected for such a reaction, for one. First Raman Rep. at 5, 6. In addition, Petitioner's prior history of eczema and rashes suggested that she was likely already predisposed. *Id.* And after vaccination, Petitioner began to display symptoms consistent with a number of different autoimmune conditions. She complained of dry eyes over time, eventually resulting in her July 2019 Sjogren's diagnosis. First Raman Rep. at 6 (*citing* Ex. 15 at 15). This timeframe was consistent with the slow progression of Sjogren's. First Raman Rep. at 6. In addition, she seemed to experience "clinical symptoms of RA," joint pain, fatigue, etc.—none of which she displayed pre-vaccination. *Id.*

In effect, Dr. Raman surmised, Petitioner likely harbored "latent autoimmune rheumatic disease," with a greater pathologic response triggered after her direct and immediate vaccine-caused hypersensitivity response. First Raman Rep. at 6. (Dr. Raman admitted, however, that Petitioner did not initially test positive for RA or lupus, although his theory seemed to rely on the idea that the stimulation of these autoimmune disease processes only occurred sometime after her initial hypersensitivity reaction). *Id.* at 6, 7.

*Second Report*

Dr. Raman's second report reacted to the initial reports of Respondent's two experts (Drs. Matloubian and MacGinnitie). He now concurred (somewhat contrary to his initial report) with

Dr. MacGinnitie's conclusion that the rapid post-vaccination onset of symptoms Petitioner experienced made it unlikely that she had experienced a Type III hypersensitivity immune reaction due to receipt of the vaccines at issue. Second Raman Rep. at 1. Indeed, Dr. Raman conceded that the self-limiting character of serum sickness/immune reactions was not likely to have triggered her subsequent, rheumatic-like symptoms. *Id*.[6]

However, Dr. Raman maintained that the concept of "trained immunity" explained Petitioner's later symptoms—and he attempted to better explain the idea in this supplemental report. Medical science had previously understood only the secondary, adaptive immune response to involve "immunological memory" (in which the immune system recognizes foreign antigens to which it has been exposed in the past, and thus "learns" to attack them in future encounters by production of antibodies or T cells specific to the presenting foreign antigen). Second Raman Rep. at 2. But more recent scientific studies had credibly proposed that the initial, innate immune reaction to a foreign antigenic stimulus could also result in a subsequent "memory response." *See* Netea at 384–85; E. Taks et al., *Shifting the Immune Memory Paradigm: Trained Immunity in Viral Infections*, 9 Annual Review of Virology 469–89 (2022), filed as Ex. 40 (ECF No. 29-2). Such a memory-driven innate reaction could be prompted by an infection or vaccination, and involves "initial epigenetic changes" to innate immune cells, rendering them "trained" to "respond more vigorously to subsequent stimuli that does not need to be the initial infection or vaccine." Second Raman Rep. at 2.

Via this proposed trained immunity process, the body mounts a more robust reaction to previously-encountered foreign antigens. Second Raman Rep. at 2. Even though this responsiveness is beneficial, Dr. Raman maintained, it "can potentially also enhance autoimmunity." *Id.* In support, Dr. Raman referenced some studies specific to lupus, another rheumatic autoimmune condition. *See* S. Funes et al., *Trained Immunity Contribution to Autoimmune and Inflammatory Disorders*, 13 Frontiers in Immunology (https://doi.org/10.3389/fimmu.2022.868343) (2022), filed as Ex. 41 (ECF No. 29-3) ("Funes"); J. Ochando et al., *Trained Immunity — Basic Concepts and Contributions to Immunopathology*, 19 Nature Reviews Nephrology 23, 23–37 (2023), filed as Ex . 42 (ECF No. 29-4) ("Ochando").

In Dr. Raman's reading, these studies demonstrated the pathogenic capacity of an initial innate immune response.[7] Funes, for example, is a review article acknowledging that even if

---

[6] Dr. Raman also agreed that 2023 MRI findings of increase white matter lesions in Petitioner's brain were unlikely to be indicative of some form of autoimmune demyelinating disease (Second Raman Rep. at 2)—although Petitioner does not allege this to be the nature of her vaccine injury, and the record does not otherwise support such a theory.

[7] Dr. Raman further referenced an unpublished study involving a lupus animal model, in which it was purportedly demonstrated that stem cells trained in the manner proposed could encourage disease. T. Mills et al., *Hematopoietic Stem Cells are a Reservoir for Trained Immunity in Autoimmune Disease* (May 20, 2022) (unpublished manuscript) (bioRxiv, doi: https://doi.org/10.1101/2022.05.20.492533). He acknowledged that the study's lack of peer review was

trained immunity due to vaccination can be beneficial, the changes caused by trained immunity (which Funes characterized as induction of epigenetic changes in certain immune cells, like macrophages) may also encourage a proinflammatory environment capable of enhancing autoimmune disease. Funes at 1. But the section of this article specific to studies considering trained immunity in a vaccine context says nothing about a negative or pathogenic result observed after vaccination, and Funes's authors acknowledged how little was still known about the manner in which vaccines might even induce trained immunity. *Id.* at 4–5. Ochando is, similarly, a big-picture overview of trained immunity as a concept—and it too acknowledges the possibility that its "induction by endogenous stimuli" could lead to an autoimmune disease. Ochando at 23. But it too provides no detailed support for the possibility of vaccination creating a persistent context of *pathology* as a result of vaccination; at most, it reviews the degree to which trained immunity could impact separately-occurring disease processes, such as kidney diseases. *Id.* at 28–29. Otherwise, "the study of trained immunity in autoimmune diseases is currently largely unexplored." *Id.* at 29.

Dr. Raman made additional comments about trained immunity in the context of vaccination when addressing Dr. Matloubian's report. Second Raman Rep. at 2–3. He cited one article as evidence specific to the context of receipt of the flu vaccine. *See* P. Debisarun et al., *Induction of Trained Immunity by Influenza Vaccination — Impact on COVID-19,* 17(10) PLoS Pathog: e1009928 (https://doi.org/10.1371/journal.ppat.1009928 (2021)), filed as Ex. 44 (ECF No. 29-6) ("Debisarun"). But Debisarun only showed (based on a sample of Dutch hospital employees) that the flu vaccine was associated with a lower incidence of a COVID infection (with some additional findings about how the trained immunity processes triggered by the vaccine might *strengthen* the immune response's resistance to subsequent inflammation). Debisarun at 3, 5–7. Thus, Debisarun does not stand for the proposition that trained immunity induced by vaccination makes an aberrant/pathologic response *more likely.*

Another unpublished study was referenced as proof the MMR vaccine could induce trained innate immunity. R. Roring et al., *MMR Vaccination Induces a Trained Immunity Program Characterized by Functional and Metabolic Reprogramming of γδ T Cells.* bioRxiv 2022.11.24.516894; doi: https://doi.org/10.1101/2022.11.24.516894 (2022), filed as Ex. 45 (ECF No. 29-7) ("Roring"). But like Debisarun, Roring is focused not on how trained immunity *encourages* disease, but instead on better understanding how trained immunity in the wake of vaccination results in immunologic benefit. Roring at 3 (noting that the reasons for the MMR vaccine's protection against "all-cause mortality in children" is not fully understood, but that it was possible that the vaccine could in part "induce long-term functional changes in innate immune cells" that might explain the protective benefits—here, by enhancing the production of certain cytokines and T cells relevant to the innate process).

---

a basis for calling its findings into question, but predicted that it would soon be published, and deemed its findings "compelling." Second Raman Rep. at 2.

Despite the above, Dr. Raman contested Dr. Matloubian's contention that it was speculative to argue that "the robust immune response with enhanced production of inflammatory cytokines by trained innate immune cells can trigger and/or exacerbate autoimmunity." Second Raman Rep. at 3. To that end, he offered some items of literature he deemed supportive of the pathogenic role of trained immunity with respect to reactive arthritis (which Dr. Raman in turn seemed to identify as Petitioner's possible diagnosis).[8] M. Jeljeli & I. Adamopoulos, *Innate Immune Memory in Inflammatory Arthritis,* 19(10) Nat. Rev. Rheumatol. 627 (2023), filed as Ex. 46 (ECF No. 29-8) ("Jeljeli & Adamopoulos"). Jeljeli & Adamopoulos is a review article discussing the pathogenic role that trained immunity might play in contributing to inflammatory arthritis generally. Jeljeli & Adamopoulos at 628. But despite the article's review of a number of immunologic cells or systems specific to the innate response, which might in turn become chronic due to training, it does not explain how a single exposure to a pathogen would "set up" this process—let alone a vaccine.

Otherwise, Dr. Raman conceded (based on Dr. Matloubian's report) that the diagnosis of Sjogren's disease could not likely be applied to Ms. Aultman. Second Raman Rep. at 2 (deeming Dr. Matloubian's argument against it, based on the record, a "cogent argument," and adding that he deferred to Dr. Matloubian's expertise on this topic). He also opined that Petitioner's post-vaccination symptoms—"inflamed joint and associated pain" beginning within a week of vaccination—may have waned over time, as Dr. Matloubian maintained, and perhaps could be merely a transient arthralgic response to the MMR vaccine. *Id.* at 3. But other symptoms had occurred, and her beneficial receipt of RA-associated drugs like Orencia was evidence of an ongoing process (given the way the medication functions). *Id.*

*Third Report*

Dr. Raman's final report offered a reaction to the supplemental reports of Drs. Matloubian and MacGinnitie, and attempted one last time to bulwark key aspects of his opinion.

For example, Dr. Raman reiterated his prior contentions that vaccines could promote trained immunity, citing an article relevant to the impact of a version of the COVID-19 vaccine. *See* D. Murphy et al., *Trained Immunity is Induced in Humans after Immunization with an Adenovira Vector COVID-19 Vaccine,* 133(2) J. Clin. Invest. 2):e162581. doi: 10.1172/JCI162581. (2023), filed as Ex. 50 (ECF No. 38-1) ("Murphy"); Third Raman Rep. at 1 (Murphy establishing that "unlike adaptive immunity this "memory" is not antigen specific"). Like prior studies offered on this point, however, Murphy largely seemed designed to demonstrate "the contributions of innate immune responses to vaccine efficacy," rather than an exploration of the negative impact of trained immunity, although Murphy itself allowed for the possibility that the

---

[8] Dr. Raman later allowed that he lacked the clinical expertise to opine on Ms. Aultman's proper diagnosis. Second Raman Rep. at 3.

proinflammatory effects of this process "may be deleterious in certain contexts." Murphy at 10, 11.

Dr. Raman emphasized this possibility, noting that "one can envision that response to heterologous antigens can induce a maladaptive immune response with pathologic consequences." Third Raman Rep. at 2. And he offered some additional evidence that he maintained supported the contention that "trained immunity can lead to dysregulated responses and development of autoimmunity"—studies relevant to RA, MS, and lupus. *See, e.g.*, M. Agarwal et al., *TET2-Mutant Clonal Hematopoiesis and Risk of Gout*, 140 Blood 1094, 1094–1103 (2022), filed as Ex. 57 (ECF No. 38-8); V. Mora et al., *Involvement of Trained Immunity During Autoimmune Responses*, 137 J. Autoimm. 102956:1 (2023), filed as Ex. 51 (ECF No. 38-2) ("Mora"); P. Vuscan et al., *Trained Immunity: General and Emerging Concepts,* 323 Immunol. Reviews 164 (2024), filed as Ex. 54 (ECF No. 38-5) ("Vuscan"); X. Li et al., *Maladaptive Innate Immune Training of Myelopoiesis Links Inflammatory Comorbidities,* 185 Cell 1709 (2022), filed as Ex. 55 (ECF No. 38-6) ("Li") (showing maladaptive training of myeloid cells (innate immune system cells produced in the bone marrow) lead to inflammatory comorbid conditions). Dr. Raman maintained that in fact there were a likely set of pathologic trained immune cells in susceptible individuals—distinct from beneficial innate response cells, and "poised to develop a dysregulated and pathologic immune response" after triggering (by vaccine or infection). Third Raman Rep. at 2.

These articles, however, are ultimately equivocal on the impact of trained immunity, noting that its effects can be both beneficial and harmful, depending on the disease, and that in any event not enough is known yet about how innate immune memory actually "works" to determine its impact. Vuscan, for example, observed that even if some degree of immune memory was possible for the innate arm of the larger immune response, it was "less specific compared to adaptive immunity," that it was known to have positive effects with respect to vaccination (citing the MMR vaccine in particular), and that more study was needed to understand its effects. Vuscan at 165, 174, 178; *see also* Mora at 7 ("further insights are needed to fully elucidate how trained immunity contributes to autoimmune disorders").

Other articles simply suggest that trained immunity stemming from *one* kind of chronic disease-causing infectious process can have knock-on effects later—a far cry from the conclusion that a vaccination would have a negative/pathologic impact. *See, e.g.*, Li at 1710 (exploring whether inflammatory cells critical to the innate immune response, but upregulated in reaction to a chronic inflammatory disease, might later persist due to trained immunity and then "influence direct inflammatory disorders that emerge as comorbidities," using the context of arthritis occurring after periodontitis). None of these articles indicate either that a vaccine could negatively impact preexisting trained immunity—or that in the context of a single vaccination, trained immunity could result in a progression of autoimmune disease responses akin to what Petitioner is alleged to have experienced.

Finally, Dr. Raman revisited his contentions about the timeframe for Petitioner's disease course, measured from the date of vaccination. Relying on Dr. Eudy's opinion, he noted that Petitioner had not experienced "full-blown" RA until several months post-vaccination. Third Raman Rep .at 2. But Dr. Raman deemed Petitioner's initial rash and joint pain to be evidence of her "maladaptive trained immunity," with her subsequent arthritic symptoms as the consequence. *Id.* He also disputed the contentions of Respondent's experts that Petitioner had not displayed inflammation in her medical history, deeming the evidence of her "inflammatory polyarthritis" (again based on Dr. Eudy's diagnostic opinion) to constitute "clear evidence of inflammation." *Id.*

2.    <u>Dr. Greg Eudy</u> — Dr. Eudy is Petitioner's existing treating rheumatologist. He offered a short opinion in support of Petitioner's claim, and another responding to the views of Respondent's two experts. *See* Report, dated Jan. 18, 2023, filed as Ex. 35 (ECF No. 24-1) ("First Eudy Rep."); Report, dated Aug. 2, 2024, filed as Ex. 60 (ECF No. 38-11) ("Second Eudy Rep.").

Dr. Eudy is a rheumatologist at Baptist Health Brookwood Hospital in Birmingham, Alabama. *Curriculum Vitae*, filed as Ex. 36 (ECF No. 24-2) ("Eudy CV"). He received his undergraduate degree from Auburn University and his medical degree from the University of Alabama. *Id.* at 1. Dr. Eudy completed his internship and residency in internal medicine at the Carolines Medical Center in Charlotte, North Carolina, before completing a fellowship in Rheumatology at Emory University. *Id.* He is board certified in Rheumatology by the American Board of Internal Medicine. *Id.* In his practice, Dr. Eudy treats hundreds of patients each year presenting with varying types of rheumatologic conditions, such as Sjogren's syndrome, reactive arthritis, and Lupus. First Rep. at 4.

In his first report, Dr. Eudy noted that he treated Petitioner after she received from Dr. Maina a diagnosis of "reactive arthritis and a delayed type III rection caused by influenza, MMR, or a combination of both vaccines." First Eudy Rep. at 1 (citing Ex. 5 at 23). Having examined Petitioner approximately sixteen times, Dr. Eudy's treatment course included a complete history and physical examination as well as laboratory testing. *Id.* Based on direct knowledge gained from this treatment, Dr. Eudy opined that Petitioner had suffered a vaccine reaction, resulting in a seronegative form of RA "and characterized by inflammatory polyneuropathy[9] in multiple sites." *Id.* at 2. The vaccines, Dr. Eudy explained, possessed the capabilities of triggering Petitioner's condition—noting further that because "[h]er condition is characterized by an excessive hyper-inflammatory response," she "likely possessed an underlying but unknown immune susceptibility." *Id.*

Dr. Eudy's second report provided an overview of Petitioner's medical history at the time of her first appointment with him in May 2019. Before vaccination, she had been in good health, and without any symptoms of rheumatological disease. Second Eudy Rep. at 2. He initially

---

[9] Dr. Eudy later clarified that he meant to say "poly*arthropathy*."

diagnosed Petitioner with "inflammatory polyarthropathy, sudden onset after MMR and flu vaccines." *Id.* Although Dr. Eudy acknowledged that Petitioner's condition "falls within a gray area of rheumatologic disease," and that "her symptomology, labs, and exam did not initially meet the diagnostic criteria for rheumatoid arthritis," he maintained that reclassification of Petitioner's diagnosis to rheumatoid arthritis was appropriate (and explained that he incorrectly employed the term "polyneuropathy" in his first report). *Id.* at 3. In response to Dr. Matloubian's criticisms, Dr. Eudy briefly reiterated his opinion that Petitioner's injury was "more likely than not" caused by the vaccines at issue—explaining further that her clinical presentation following vaccination, and the temporal association are not only consistent with inflammatory arthritis but can be triggered by vaccination. *Id.*

B.    *Respondent's Experts*

1.    <u>Dr. Mehrdad Matloubian, M.D., Ph.D.</u> — Dr. Matloubian, a rheumatologist and academic medical professional, authored two reports on Respondent's behalf. Report, dated July 22, 2023, filed as Ex. A (ECF No. 23-1) ("First Matloubian Rep."); Report, dated Apr. 8, 2024, filed as Ex. E (ECF No. 33-1) (Second Matloubian Rep.").

Dr. Matloubian is a practicing neurologist and professor at the University of California San Francisco. *Curriculum Vitae*, filed as Ex. B (ECF No. 23-18) ("Matloubian CV") at 1. He received both a medical degree and a Ph.D. in Virology from the University of California Los Angeles. *Id.* Thereafter, Dr. Matloubian completed a residency, fellowship in Rheumatology, and post-doctoral fellowship at the University of California San Francisco. *Id.* He is board certified in Rheumatology by the American Board of Internal Medicine. *Id.* at 2. Dr. Matloubian's research focuses on "innate and adaptive immune responses, including those of T and B cells, to acute and chronic viral infections." First Matloubian Rep. at 1. He has also authored articles in numerous peer-reviewed publications related to those topics. Matloubian CV at 10–15.

*First Report*

Dr. Matloubian began his initial report with a detailed review of Petitioner's medical history as established by the filed records. First Matloubian Rep. at 1–17. He noted Petitioner's previous experience of rashes in 2017 and 2018, for which she was variously treated with steroids and antihistamines. *Id.* at 2. Soon after the October 1, 2018 vaccination, Petitioner reported diffuse joint pain without any evidence of swelling which was not responsive to steroids. *Id.* at 3. However, Dr. Matloubian noted, no treating physician found any evidence of swelling in the small joints of Petitioner's hands until *September 2019*—approximately one-year post-vaccination. *Id.* at 13 (citing Ex. 34 at 54). For example, Petitioner reported musculoskeletal issues and was evaluated in March 2019 by a rheumatologist (Dr. Tran), who found no evidence of inflammatory arthritis. *Id.* at 9. In fact, numerous blood tests ordered by Dr. Tran revealed negative or normal results—

thus, "reducing the likelihood of a systemic inflammatory autoimmune rheumatologic process." *Id.* at 17. The first time a treater proposed the existence of a rheumatic disorder was in May 2019, when Petitioner was examined by Dr. Eudy—but this was seven months post-vaccination. First Matloubian Rep. at 17. At that time, Petitioner was diagnosed with "seronegative RA" despite her lack of joint inflammation, and Sjogren's Disease despite the presence of associated autoantibodies or confirmatory testing. *Id.*

Dr. Matloubian then went on to evaluate the different diagnoses considered throughout Petitioner's medical records. He opined that Petitioner likely did not have a "type III hypersensitivity response" to vaccination. First Matloubian Rep. at 18. The classic clinical presentation of type III hypersensitivity reactions, Dr. Matloubian explained, is serum sickness. *Id.*; W. Pichler, *Drug Hypersensitivity: Classification and Clinical Features* (2023), filed as Ex. A-1 (ECF No. 23-2) ("Pichler"). But Petitioner did not likely have serum sickness, as she did not present with a fever. First Matloubian Rep. at 18. Although blood tests were not done when Petitioner initially presented to the ED, they were later performed (on November 30, 2018), and by this time "they showed normal complements and inflammatory markers, which are typically abnormal during an acute episode of serum sickness," according to Dr. Matloubian. *Id.* at 19.

Dr. Matloubian did accept that Petitioner's reported symptoms of itchy rash, facial swelling, joint pain, and shortness of breath were consistent with a diagnosis of a type I, or "IgE mediated" hypersensitivity response, as such responses are typically immediate in nature and occur shortly after exposure to a foreign antigen. First Matloubian Rep. at 18; Pichler at 3, 7. He explained that "[t]he differential diagnosis for rash seen in serum sickness includes viral exanthems, i.e., rashes that occur in the setting of a virus infection," but noting further that rashes associated with both serum sickness and virus infections are self-limiting and oftentimes resolve within weeks. First Matloubian Rep. at 19; M. Wener, *Serum Sickness and Serum Sickness-like Reactions* (2023), filed as Ex. A-2 (ECF No. 23-3). Thus, Dr. Matloubian opined, despite the difficulty in distinguishing between serum sickness and a viral infection-associated rash, the evidence did not support the conclusion that she had experienced a type III hypersensitivity response. First Matloubian Rep. at 19.

Similarly, Dr. Matloubian took issue with Dr. Eudy's diagnosis of reactive arthritis. First Matloubian Rep. at 19. Reactive arthritis is defined as "an inflammatory oligoarticular (one to three joints) asymmetric arthritis that occurs within several days to weeks [following] certain gastrointestinal or genitourinary infections." *Id.*; A. Cheeti et al., *Reactive Arthritis*, StatPearls (2023), filed as Ex. A-4 (ECF No. 23-5). Reactive arthritis is known to have a benign course, with symptoms resolving in less than six months in at least half of individuals, and within a year in the majority of cases. First Matloubian Rep. at 19; D. Yu & A. Tubergen, M.D., Ph.D., *Reactive Arthritis*, Wolters Kluwer at 3 (2023), filed as Ex. A-5 (ECF No. 23-6). But in this case, "Petitioner's pattern of symmetric joint involvement as well as the large number of joints without

observed joint swelling and lack of reported response to prednisone does not fit with a diagnosis of reactive arthritis." First Matloubian Rep. at 20.

Rather, Petitioner's initial symptoms (i.e., transient rash and arthralgias) were consistent with side effects associated with the rubella component of the MMR vaccine, which can occur in up to 25% of adults. First Matloubian Rep. at 19, 20–21; P. Hibbered, *Measles Mumps and Rubella Immunization in Adults*, UpToDate (2023), https://www.uptodate.com/contents/measles-mumps-and-rubella-immunization-in-adults (last visited July 11, 2025), filed as Ex. A-6 (ECF No. 23-7) (concluding that the evidence favors accepting a relation between transient arthralgias following receipt of MMR vaccines); *Adverse Effects of Vaccines: Evidence and Causality* 180–81 (K. Stratton et al., eds., 2011) ("IOM Rep.");[10] J. Watson et al., *Measles, Mumps, and Rubella— Vaccine Use and Strategies for Elimination of Measles, rubella, and Congenital Rubella Syndrome and Control of Mumps: Recommendations of the Advisory Committee on Immunization Practices (ACIP)*, 47 MMWR Recommendation Rep 1–57 (1998), filed as Ex. A-3 (ECF No. 23-4). But chronic joint pain was not a recognized MMR side effect. First Matloubian Rep. at 21.

Dr. Matloubian also opined that Petitioner likely did not also have RA. First Matloubian Rep. at 23–26. RA, he explained, is a common "systematic inflammatory disease" characterized by arthritis in the small joints of the hands and feet, more often than not affecting women between the ages of 50 and 75. *Id.* at 23. To diagnose RA, a treater must first exclude a number of other rheumatic diseases (e.g., lupus or reactive arthritis) or infectious diseases, and they must also distinguish the possibility of osteoarthritis or fibromyalgia (which features joint pain without inflammation). *Id.* According to accepted diagnostic standards, a physician must identify objective evidence of joint inflammation (either swelling or warmth) in order to even begin to apply the diagnostic criteria for RA. *Id.* Because Petitioner did not show signs of joint inflammation, she could not be properly diagnosed with RA. *Id.* at 24. Petitioner did not demonstrate swelling in the small joints of the hands—a hallmark of RA—until almost a year after her vaccinations, making it unlikely that such symptoms were connected to the vaccination. *Id.* at 25. A later ultrasound of Petitioner's hand also revealed signs of degenerative joint disease, rather than an inflammatory process like RA. *Id.* at 26. Dr. Matloubian opined that a diagnosis of trochanteric bursitis (now known as greater trochanteric pain syndrome, or "GTPS") would be more appropriate to explain her hip pain. *Id.* GTPS is common, and Petitioner displayed several of the associated risk factors, including knee pain. *Id.*

Dr. Matloubian went on to specifically address the mechanistic components of Dr. Raman's theory. First Matloubian Rep. at 27–31. In his view, neither of the vaccines that Petitioner received were likely to cause a type III hypersensitivity response. *Id.* at 29. The flu vaccine is

---

[10] The IOM Report also noted, however, that "a large retrospective cohort study with appropriately defined exposed and control groups found *no* evidence of an association between [MMR] immunization and chronic arthropathy." IOM Rep. at 191.

inactivated, so it could not by itself produce enough antibodies to form the necessary immune complexes for a type III reaction. *Id.* The MMR vaccine, by contrast, has attenuated but live components, but it has not been shown in medical literature to be capable of causing a type III reaction in any medical literature. *Id.*

Dr. Matloubian also questioned Dr. Raman's theory that Petitioner had a preexisting pre-clinical autoimmune disease that was "triggered" by an immune response to her vaccinations, deeming it speculative and unsupported by the medical literature. First Matloubian Rep. at 29–30. In particular, the theory that Petitioner's vaccination was the "environmental factor" that "transitioned" a disease process into something clinically overt was only supported by the vaguest hypotheticals in the cited literature. *Id.* at 30. Instead, research suggests that the factors that trigger autoimmune disease are extant in the body years before symptoms present. *Id.*

Dr. Matloubian briefly challenged the applicability of trained immunity, claiming that there was no evidence of its occurrence in the context of receipt of the flu or MMR vaccines. First Matloubian Rep. at 31. And he questioned whether the timing of Petitioner's symptoms was consistent with vaccine causation, noting that Petitioner did not exhibit any symptoms that were "indicative of a diagnosable specific rheumatologic autoimmune disease" within a reasonable time of receiving vaccines on October 1, 2018. *Id.*

*Second Report*

Dr. Matloubian began his second report with a brief review of newly-submitted medical records. Second Matloubian Rep. at 1–2. He then responded to Dr. Eudy's first report, reiterating his previous criticisms. *Id.* at 2–3. He maintained, for example, that Dr. Eudy had erroneously deferred to Dr. Maina's diagnosis of "reactive arthritis and delayed type III reaction," despite Petitioner's lack of observed joint swelling. *Id.* (referencing Second Eudy Rep. at 2 (quoting Ex. 35 at 4)). Additionally, Dr. Matloubian clarified that "inflammatory polyarthropathy" is a "vague term and not a specific diagnosis," and that Petitioner never had an established diagnosis of it, contrary to Dr. Eudy's representations. Second Matloubian Rep. at 3.

Dr. Matloubian went on to discuss Dr. Raman's second report. Second Matloubian Rep. at 3. He reiterated the lack of record evidence supporting the diagnoses of inflammatory disease, Sjogren's Disease, or lupus. *Id.* at 4–5. Dr. Raman's second report had in fact conceded that Petitioner likely did not experience a type III hypersensitivity reaction. *Id.*

Dr. Matloubian also reacted to the literature offered by Dr. Raman in support of the trained immunity theory, noting that none of the studies proposed a role for vaccines in causing disease as a result of such a process. Second Matloubian Rep. at 6. In fact, some of the cited literature suggested that immunizations might actually "downregulate" systemic inflammation. *Id.* (citing

Debisarun at 5). And Dr. Matloubian opined that Dr. Raman had not offered an acceptable timeframe during which a trained immunity process could have caused autoimmune disease in Petitioner, mostly due to the lack of data supporting the proposed mechanism. Second Matloubian Rep. at 7. He cast doubt on Petitioner's positive response to the medication Orencia as evidence that she suffered from an autoimmune disorder, as blind trials for RA treatment have shown that a significant portion of placebo group experience symptom improvement without intervention. *Id*. at 8.

      2.    <u>Dr. Andrew MacGinnitie, M.D., Ph.D</u>. – Dr. MacGinnitie, an allergist, immunologist, and pediatrician, authored two reports on Respondent's behalf. Report, dated July 21, 2023, filed as Ex. C (ECF No. 23-19) (First MacGinnitie Rep."); Report, dated April 8, 2024, filed as Ex. F (ECF No. 33-3) ("Second MacGinnitie Rep.").

      Dr. MacGinnitie is the Section Chief of the Division of Allergy, Asthma, and Clinical Immunology at Children's Hospital Wisconsin, and a professor of pediatrics at the Medical College of Wisconsin. Second MacGinnitie Rep. at 1. Until recently, he was the Clinical Chief for the Division of Immunology at Boston Children's Hospital overseeing clinical operations for Allergy/Immunology, Rheumatology and Dermatology, and an associate professor of pediatrics at Harvard Medical School. First MacGinnitie Rep. at 1. He received his undergraduate degree from Yale University before receiving both a Ph.D. in pathology and an M.D. from the University of Chicago Pritzker School of Medicine. *Curriculum Vitae*, filed as Ex. D (ECF No. 23-28) ("MacGinnitie CV") at 1. Dr. MacGinnitie completed his residency in pediatrics at the Boston Combined Residency Program (between Boston Children's Hospital and Boston Medical Center), and a fellowship in allergy and immunology at Boston Children's Hospital. *Id*. He is board certified in both allergy and immunology (by the American Board of Allergy and Immunology) as well as pediatrics (by the American Board of Pediatrics). *Id*. at 11. Dr. MacGinnitie has published articles in peer-reviewed journals related to "vaccine reactions and primary immunodeficiency." First MacGinnitie Rep. at 2.

*First Report*

      Dr. MacGinnitie began his first report with an overview of the medical records before discussing Petitioner's causation theory. First MacGinnitie Rep. at 2–11. As he understood it, Dr. Raman's opinion was that a type III hypersensitivity reaction ("serum sickness") to her vaccinations activated her immune system and triggered autoimmune diseases (RA and Sjogen's Disease). *Id*. at 11. Unlike Dr. Matloubian, Dr. MacGinnitie allowed for the possibility of serum sickness triggered by an influenza vaccine. *Id*. at 12–13. Some of Petitioner's symptoms, like rash and joint pain, were consistent with serum sickness, and she responded somewhat to treatments like antihistamines and steroids. *Id*. at 12 But her other symptoms were not characteristic of serum sickness, and she did not have a fever. *Id*. More importantly, her laboratory results did not show

18

signs of ongoing inflammation, and the reported symptom onset time frame of two days is "faster than would be expected for a serum sickness/type III reaction." *Id*. Ultimately, Dr. MacGinnitie felt the timing of onset made this diagnosis unsupported. *Id*. at 12–13.

Regardless, Dr. MacGinnitie disputed the contention that serum sickness could result in subsequent disease. First MacGinnitie Rep. at 13. Serum sickness is self-limiting and transient, so most instances of it resolve within a few weeks of onset. First MacGinnitie Rep. at 13 (citing Usman & Annamaraju at 8). Furthermore, Dr. MacGinnitie noted that no evidence has been provided ("not even a single case report") to show that serum sickness can subsequently result in chronic autoimmunity, nor any mechanism proposed that would explain how such a process would unfold. First MacGinnitie Rep. at 13. And Petitioner's blood tests demonstrated a "clear lack of inflammation and autoimmunity," which would have been required to support Dr. Raman's theory. *Id*. at 13–14.

*Second Report*

Dr. MacGinnitie's second report responded to Dr. Raman's supplemental report, in which he discussed the theory of trained immunity. Second MacGinnitie Rep. at 1. Like Dr. Matloubian, Dr. MacGinnitie noted the ambiguity surrounding Petitioner's diagnosis, emphasizing the lack of evidence of inflammation in Petitioner's medical records. *Id*. at 2. Regarding the concept of trained immunity, Dr. MacGinnitie expressed the view (like Dr. Matloubian) that there is no evidence linking trained immunity of the innate response due to vaccination to the subsequent development of autoimmune disease. *Id*. Trained immunity is typically thought to occur when there are "changes in innate immune cells after one stimulus that leads to a more vigorous response to a second stimulus." *Id*. Even if Dr. Raman believed Petitioner's vaccinations constituted the first such stimulus, the second one had not been clearly identified. *Id*. Dr. MacGinnitie also noted that vaccines do not present an "unusual stimulus" to the immune system. And Petitioner's positive response to Orencia is evidence against trained immunity as a mechanism, as it impacts the *adaptive* immune response. *Id*.

## III.    Procedural History

This matter was assigned to me on March 4, 2022. On August 15, 2022, Respondent filed his Rule 4(c) Report contesting Petitioner's right to compensation. *See* Report, dated Aug. 15, 2022 (ECF No. 16). The parties began the process of obtaining expert reports with the final report from Dr. Raman filed on August 5, 2024. Thereafter, I determined that matter could be decided on the papers, and the parties submitted briefs supporting their respective positions. The matter is now ripe for resolution.

IV.    **Parties' Arguments**

*Petitioner*

Petitioner maintains that she has preponderantly demonstrated that the flu and MMR vaccines can cause inflammatory arthropathy (which she defines to include RA). Br. at 22–26. The MMR vaccine she received likely triggered "trained immunity" of her innate immune response, which in turn caused her form of inflammatory polyarthropathy. *Id.* at 1. Because trained immune cells can become dysregulated, "their response to a heterologous antigen can induce a maladaptive immune response with pathologic consequences." *Id.* at 24 (citing Second Raman Rep. at 2). In support, she referenced studies that have demonstrated the involvement of trained immunity in other autoimmune disorders, such as lupus. Br. at 24; Funes at 6, 10; Ochando at 30. And she references another review article that discusses trained immunity as a causal mechanism of inflammatory arthropathies. Br. at 25–26; *see also* Jeljeli & Adamopoulos at 628–29.

Next, Petitioner argues that her receipt of the flu and MMR vaccines specifically caused her injury. Br. at 29. She claims that she experienced no symptoms of a hyper-inflammatory syndrome prior to her vaccinations, but that two days later she experienced "early reactions such as rashes and itching." *Id.* Petitioner further recounts her symptom and treatment chronology, noting that as her symptoms progressed, her treaters ruled out other causes and eventually landed on a diagnosis of inflammatory arthropathy, or seronegative RA. *Id.* Moreover, Drs. Eudy and Raman both found "that [Petitioner's] clinical course and progressive development of her RA symptoms are consistent with the vaccine as the principal cause." *Id.* at 30.

Finally, Petitioner claims that the onset of her injury falls within a medically acceptable timeframe. Br. at 32. She began to experience symptoms two days post-vaccination and reported such symptoms to her employee health center seven days post-vaccination. *Id.* (citing Ex. 4 at 146). Petitioner describes her initial symptoms as more allergic in nature (i.e., rash, itching, difficulty breathing), before the onset of joint pain throughout her body. *Id.* at 32. Thus, she argues that her earlier symptoms are indicative of an inflammatory process, and that a two-day onset is consistent with the theory of trained immunity. *Id.* at 32–33.

In her reply, Petitioner characterizes Respondent's argument as elevating her burden of proof such that it requires her to prove with certainty that vaccines cause inflammatory arthropathy. Reply at 2. She emphasizes Dr. Eudy's credibility as her treating physician, arguing that he is uniquely qualified to opine on her clinical presentation and diagnosis. *Id.* at 3. Petitioner maintains that she has proven her vaccinations caused her arthropathy and RA by a preponderance of the evidence, and that she is not required to provide direct evidence of causation. *Id.* at 4. She further argues that Dr. Raman has shown that vaccines cause trained immunity, MMR and flu vaccines cause trained immunity, and trained immunity contributes to autoimmunity. *Id.* at 5. Taken

together, these "steps" constitute circumstantial evidence of Petitioner's medical theory. *Id.*
Although her treating physicians may not have come to the same diagnosis, Petitioner nevertheless,
emphasizes that they all agreed with the conclusion that her symptoms were in reaction to her
vaccination. *Id.* at 7.

*Respondent*

Respondent contends that entitlement is not appropriate in this case. Opp. at 2. First, he
argues that Petitioner has failed to show by a preponderance of evidence that she has RA. *Id.* at
19. To bulwark this assertion, Respondent references Dr. Matloubian's opinion that the record
shows little evidence that Petitioner experienced inflammatory arthritis, as well as Dr.
MacGinnitie's finding that Petitioner's laboratory testing results did not show "significant ongoing
inflammation or autoimmunity." *Id.* (citing Second Matloubian Rep. at 4, First MacGinnitie Rep.
at 14). He further emphasizes Petitioner's clinical course as inconsistent with RA, particularly due
to her lack of joint swelling. *Id.* at 20. And "much of the pain that [P]etitioner described in the
period immediately after vaccination can be explained by musculoskeletal or neuropathic
etiologies, rather than rheumatic ones." *Id.* at 21.

Next, Respondent argues that Petitioner has not met her burden set forth in *Althen v. Sec'y
of Health and Hum. Servs.,* 418 F.3d 1274, 1278 (Fed. Cir. 2005). Opp. at 21. While vaccines may
be capable of producing some trained immunity, there is no compelling support for the proposition
that trained immunity caused by vaccination can *also* contribute to autoimmune diseases. *Id.* at 22.
Rather, vaccinations "do not represent an unusual stimulus for the immune system and [they] are
not a strong trigger for trained immunity." *Id.* at 24 (citing Second MacGinnitie Rep. at 3).
Moreover, the medical literature connecting trained immunity to inflammatory disease is "largely
speculative." *Id.* at 25. Chronic inflammation due to an ongoing autoimmune disease may in fact
stimulate the innate immune system in a way that appears similar to trained immunity. *Id.* at 27.

Lastly, Respondent maintains that Petitioner has failed to show that the vaccines she
received did cause her arthropathy by a preponderance of the evidence—superficially due to the
lack of inflammatory markers in her lab results. Opp. at 28. Petitioner relies heavily on the
conclusions reached by her treating physician, Dr. Eudy, to show that her injury was caused-in-
fact by her vaccination. *Id.* But Dr. Eudy's opinion does not merit weight simply because he is a
treating physician, and in any event his conclusions lack evidentiary support. *Id.* at 28–29.
Petitioner has also failed to provide a medically acceptable timeline regarding the onset of her
arthropathy, both because she has not provided a credible medical theory on which to base a
timeline to explain how a "full-blown rheumatic condition could develop," and because
Petitioner's statements regarding the onset of her condition are "unclear and inconsistent with her
clinical picture." *Id.* at 30, 31.

21

## V.    Applicable Legal Standards

### A.    *Petitioner's Overall Burden in Vaccine Program Cases*

To receive compensation in the Vaccine Program, a petitioner must prove either: (1) that he suffered a "Table Injury"—i.e., an injury falling within the Vaccine Injury Table—corresponding to one of the vaccinations in question within a statutorily prescribed period of time or, in the alternative, (2) that his illnesses were actually caused by a vaccine (a "Non-Table Injury"). *See* Sections 13(a)(1)(A), 11(c)(1), and 14(a), as amended by 42 C.F.R. § 100.3; § 11(c)(1)(C)(ii)(I);  *see also Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010); *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1320 (Fed. Cir. 2006).[11] Although there is Table claim for "chronic arthritis" after receipt of rubella-containing vaccines, Petitioner does not allege such an injury.

For both Table and Non-Table claims, Vaccine Program petitioners bear a "preponderance of the evidence" burden of proof. Section 13(1)(a).  That is, a petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly*, 592 F.3d at 1322 n.2; *see also Snowbank Enter. V. United States*, 6 Cl. Ct. 476, 486 (1984) (mere conjecture or speculation is insufficient under a preponderance standard). Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Hum. Servs.*, 931 F.2d 867, 873 (Fed. Cir. 1991). In particular, a petitioner must demonstrate that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321 (quoting *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352–53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Hum. Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). A petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. Section 13(a)(1).

In attempting to establish entitlement to a Vaccine Program award of compensation for a Non-Table claim, a petitioner must satisfy all three of the elements established by the Federal Circuit in *Althen* 418 F.3d at 1278: "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury."

---

[11]  Decisions of special masters (some of which I reference in this ruling) constitute persuasive but not binding authority. *Hanlon v. Sec'y of Health & Hum. Servs.*, 40 Fed. Cl. 625, 630 (1998). By contrast, Federal Circuit rulings concerning legal issues are binding on special masters. *Guillory v. Sec'y of Health & Hum. Servs.*, 59 Fed. Cl. 121, 124 (2003), *aff'd* 104 F. App'x. 712 (Fed. Cir. 2004); *see also Spooner v. Sec'y of Health & Hum. Servs.*, No. 13-159V, 2014 WL 504728, at *7 n.12 (Fed. Cl. Spec. Mstr. Jan. 16, 2014).

Each *Althen* prong requires a different showing. Under *Althen* prong one, petitioners must provide a "reputable medical theory," demonstrating that the vaccine received *can cause* the type of injury alleged. *Pafford*, 451 F.3d at 1355–56 (citations omitted). To satisfy this prong, a petitioner's theory must be based on a "sound and reliable medical or scientific explanation." *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 548 (Fed. Cir. 1994). Such a theory must only be "legally probable, not medically or scientifically certain." *Id.* at 549.

Petitioners may satisfy the first *Althen* prong without resort to medical literature, epidemiological studies, demonstration of a specific mechanism, or a generally accepted medical theory. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1378–79 (Fed. Cir. 2009) (citing *Capizzano*, 440 F.3d at 1325–26). Special masters, despite their expertise, are not empowered by statute to conclusively resolve what are essentially thorny scientific and medical questions, and thus scientific evidence offered to establish *Althen* prong one is viewed "not through the lens of the laboratorian, but instead from the vantage point of the Vaccine Act's preponderant evidence standard." *Id.* at 1380. Distinguishing between "preponderant evidence" and "medical certainty" is important because special masters must take care not to impose an evidentiary burden that is too high. *Bunting v. Sec'y of Health & Human Servs.*, 931 F.2d 867, 873 (Fed.Cir.1991) ("The standard of proof required by the [Vaccine] Act is simple preponderance of evidence; not scientific certainty.... [I]t is not plaintiff's burden to disprove every possible ground of causation suggested by defendant nor must the findings of the court meet the standards of the laboratorian.") (citations and internal quotation marks omitted).

Nevertheless, the Federal Circuit has consistently rejected the contention that a petitioner's prong one burden can be satisfied merely by establishing the proposed causal theory's scientific or medical *plausibility*. *See Kalajdzic v. Sec'y of Health & Hum. Servs.*, No. 2023-1321, 2024 WL 3064398, at *2 (Fed. Cir. June 20, 2024) (arguments "for a less than preponderance standard" deemed "plainly inconsistent with our precedent" (*citing Moberly*, 592 F.3d at 1322)); *Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1359 (Fed. Cir. 2019); *see also Demore v. Sec'y of Health & Hum. Servs.*, No. 20-1265V, 2024 WL 4542934 (Fed. Cl. Spec. Mstr. Sept. 26, 2024), *aff'd*, No. 20-1265V, 2025 WL 868902, at *4 (Fed. Cl. Mar. 20, 2025) (rejecting the argument that a petitioner's burden is to prove that a causation theory is *plausible* and instead requiring petitioner to prove the theory by a preponderance of the evidence) (emphasis added). And petitioners always have the ultimate burden of establishing their *overall* Vaccine Act claim with preponderant evidence. *W.C. v. Sec'y of Health & Hum. Servs.*, 704 F.3d 1352, 1356 (Fed. Cir. 2013) (citations omitted); *Tarsell v. United States*, 133 Fed. Cl. 782, 793 (2017) (noting that *Moberly* "addresses the petitioner's overall burden of proving causation-in-fact under the Vaccine Act" by a preponderance standard).

The second *Althen* prong requires proof of a logical sequence of cause and effect, usually supported by facts derived from a petitioner's medical records. *Althen*, 418 F.3d at 1278; *Andreu*,

23

569 F.3d at 1375–77; *Capizzano*, 440 F.3d at 1326; *Grant v. Sec'y of Health & Hum. Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992). In establishing that a vaccine "did cause" injury, the opinions and views of the injured party's treating physicians are entitled to some weight. *Andreu*, 569 F.3d at 1367; *Capizzano*, 440 F.3d at 1326 ("medical records and medical opinion testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether a 'logical sequence of cause and effect show[s] that the vaccination was the reason for the injury'") (quoting *Althen*, 418 F.3d at 1280). Medical records are generally viewed as particularly trustworthy evidence, since they are created contemporaneously with the treatment of the patient. *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Medical records and statements of a treating physician, however, do not *per se* bind the special master to adopt the conclusions of such an individual, even if they must be considered and carefully evaluated. Section 13(b)(1) (providing that "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court"); *Snyder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 746 n.67 (2009) ("there is nothing . . . that mandates that the testimony of a treating physician is sacrosanct—that it must be accepted in its entirety and cannot be rebutted"). As with expert testimony offered to establish a theory of causation, the opinions or diagnoses of treating physicians are only as trustworthy as the reasonableness of their suppositions or bases. The views of treating physicians should be weighed against other, contrary evidence also present in the record—including conflicting opinions among such individuals. *Hibbard v. Sec'y of Health & Hum. Servs.*, 100 Fed. Cl. 742, 749 (2011) (not arbitrary or capricious for special master to weigh competing treating physicians' conclusions against each other), *aff'd*, 698 F.3d 1355 (Fed. Cir. 2012); *Veryzer v. Sec'y of Dept. of Health & Hum. Servs.*, No. 06-522V, 2011 WL 1935813, at *17 (Fed. Cl. Spec. Mstr. Apr. 29, 2011), *mot. for review den'd*, 100 Fed. Cl. 344, 356 (2011), *aff'd without opinion*, 475 F. Appx. 765 (Fed. Cir. 2012).

The third *Althen* prong requires establishing a "proximate temporal relationship" between the vaccination and the injury alleged. *Althen*, 418 F.3d at 1281. That term has been equated to the phrase "medically-acceptable temporal relationship." *Id.* A petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation." *De Bazan v. Sec'y of Health & Hum. Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008). The explanation for what is medically acceptable timeframe must align with the theory of how the relevant vaccine can cause an injury (*Althen* prong one's requirement). *Id.* at 1352; *Shapiro v. Sec'y of Health & Hum. Servs.*, 101 Fed. Cl. 532, 542 (2011), *recons. Den'd after remand*, 105 Fed. Cl. 353 (2012), *aff'd mem.*, 503 F. Appx. 952 (Fed. Cir. 2013); *Koehn v. Sec'y of Health & Hum. Servs.*, No. 11-355V, 2013 WL 3214877 (Fed. Cl. Spec. Mstr. May 30, 2013), *mot. for rev. den'd* (Fed. Cl. Dec. 3, 2013), *aff'd*, 773 F.3d 1239 (Fed. Cir. 2014).

B.    *Legal Standards Governing Factual Determinations*

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records. Section 11I(2). The special master is required to consider "all [ ] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as the "results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." Section 13(b)(1)(A). The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (determining that it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is evidenced by a rational determination).

As noted by the Federal Circuit, "[m]edical records, in general, warrant consideration as trustworthy evidence." *Cucuras*, 993 F.2d at 1528; *Doe/70 v. Sec'y of Health & Hum. Servs.*, 95 Fed. Cl. 598, 608 (2010) ("[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"), *aff'd*, *Rickett v. Sec'y of Health & Hum. Servs.*, 468 F. App'x 952 (Fed. Cir. 2011) (non-precedential opinion). A series of linked propositions explains why such records deserve some weight: (i) sick people visit medical professionals; (ii) sick people attempt to honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in as accurate a manner as possible, so that they are aware of enough relevant facts to make appropriate treatment decisions. *Sanchez v. Sec'y of Health & Hum. Servs.*, No. 11–685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013); *Cucuras*, 993 F.2d at 1525 ("[i]t strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms").

Accordingly, if the medical records are clear, consistent, and complete, then they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03–1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). Indeed, contemporaneous medical records are often found to be deserving of greater evidentiary weight than oral testimony— especially where such testimony conflicts with the record evidence. *Cucuras*, 993 F.2d at 1528; *see also Murphy v. Sec'y of Health & Hum. Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992), *cert. den'd*, *Murphy v. Sullivan*, 506 U.S. 974 (1992) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1947) ("[i]t has generally been held that

oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight.")).

However, the Federal Circuit has also noted that there is no formal "presumption" that records are accurate or superior on their face to other forms of evidence. *Kirby v. Sec'y of Health & Hum. Servs.,* 997 F.3d 1378, 1383 (Fed. Cir. 2021). There are certainly situations in which compelling oral or written testimony (provided in the form of an affidavit or declaration) may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health & Hum. Servs.,* 69 Fed. Cl. 775, 779 (2006) ("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie,* 2005 WL 6117475, at *19 ("[w]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent") (quoting *Murphy,* 23 Cl. Ct. at 733)). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be afforded. *Andreu,* 569 F.3d at 1379; *Bradley v. Sec'y of Health & Hum. Servs.,* 991 F.2d 1570, 1575 (Fed. Cir. 1993).

When witness testimony is offered to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Sanchez,* 2013 WL 1880825, at *3 (citing *Blutstein v. Sec'y of Health & Hum. Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.,* 110 Fed. Cl. 184, 203–04 (2013), *aff'd,* 746 F.3d 1334 (Fed. Cir. 2014). In making a determination regarding whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony at hearing, there must be evidence that this decision was the result of a rational determination. *Burns,* 3 F.3d at 417.

### C.    *Analysis of Expert Testimony*

Establishing a sound and reliable medical theory often requires a petitioner to present expert testimony in support of his claim. *Lampe v. Sec'y of Health & Hum. Servs.,* 219 F.3d 1357, 1361 (Fed. Cir. 2000). Vaccine Program expert testimony is usually evaluated according to the factors for analyzing scientific reliability set forth in *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 594–96 (1993). *See Cedillo v. Sec'y of Health & Hum. Servs.,* 617 F.3d 1328, 1339 (Fed.

Cir. 2010) (citing *Terran v. Sec'y of Health & Hum. Servs.*, 195 F.3d 1302, 1316 (Fed. Cir. 1999). Under *Daubert*, the factors for analyzing the reliability of testimony are:

> (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards for controlling the error; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community.

*Terran*, 195 F.3d at 1316 n.2 (citing *Daubert*, 509 U.S. at 592–95).

In the Vaccine Program the *Daubert* factors play a slightly different role than they do when applied in other federal judicial settings, like the district courts. Typically, *Daubert* factors are employed by judges (in the performance of their evidentiary gatekeeper roles) to exclude evidence that is unreliable or could confuse a jury. By contrast, in Vaccine Program cases these factors are used in the *weighing* of the reliability of scientific evidence proffered. *Davis v. Sec'y of Health & Hum. Servs.*, 94 Fed. Cl. 53, 66–67 (2010) ("uniquely in this Circuit, the *Daubert* factors have been employed also as an acceptable evidentiary-gauging tool with respect to persuasiveness of expert testimony already admitted"). The flexible use of the *Daubert* factors to evaluate the persuasiveness and reliability of expert testimony has routinely been upheld. *See, e.g.*, *Snyder*, 88 Fed. Cl. at 742–45. In this matter (as in numerous other Vaccine Program cases), *Daubert* has not been employed at the threshold, to determine what evidence should be admitted, but instead to determine whether expert testimony offered is reliable and/or persuasive.

Respondent frequently offers one or more experts in order to rebut a petitioner's case. Where both sides offer expert testimony, a special master's decision may be "based on the credibility of the experts and the relative persuasiveness of their competing theories." *Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1347 (Fed. Cir. 2010) (citing *Lampe*, 219 F.3d at 1362). However, nothing requires the acceptance of an expert's conclusion "connected to existing data only by the *ipse dixit* of the expert," especially if "there is simply too great an analytical gap between the data and the opinion proffered." *Snyder*, 88 Fed. Cl. at 743 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 146 (1997)); *see also Isaac v. Sec'y of Health & Hum. Servs.*, No. 08–601V, 2012 WL 3609993, at *17 (Fed. Cl. Spec. Mstr. July 30, 2012), *mot. for review den'd*, 108 Fed. Cl. 743 (2013), *aff'd*, 540 F. App'x. 999 (Fed. Cir. 2013) (citing *Cedillo*, 617 F.3d at 1339). Weighing the relative persuasiveness of competing expert testimony, based on a particular expert's credibility, is part of the overall reliability analysis to which special masters must subject expert testimony in Vaccine Program cases. *Moberly*, 592 F.3d at 1325–26 ("[a]ssessments as to the reliability of expert testimony often turn on credibility determinations"); *see also Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1250 (Fed. Cir. 2011) ("this

court has unambiguously explained that special masters are expected to consider the credibility of expert witnesses in evaluating petitions for compensation under the Vaccine Act").

### D.    *Consideration of Medical Literature*

Both parties filed medical and scientific literature in this case, but not all such items factor into the outcome of this decision. While I have reviewed all the medical literature submitted, I discuss only those articles that are most relevant to my determination and/or are central to Petitioner's case—just as I have not exhaustively discussed every individual medical record filed. *Moriarty v. Sec'y of Health & Hum. Servs.*, No. 2015–5072, 2016 WL 1358616, at *5 (Fed. Cir. Apr. 6, 2016) ("[w]e generally presume that a special master considered the relevant record evidence even though he does not explicitly reference such evidence in his decision") (citation omitted); *see also Paterek v. Sec'y of Health & Hum. Servs.,* 527 F. App'x 875, 884 (Fed. Cir. 2013) ("[f]inding certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered").

### E.    *Resolution of Case on Papers*

I am resolving Petitioner's claim on the filed record. The Vaccine Act and Rules not only contemplate but encourage special masters to decide petitions on the papers where (in the exercise of their discretion) they conclude that doing so will properly and fairly resolve the case. Section 12(d)(2)(D); Vaccine Rule 8(d). The decision to rule on the record in lieu of hearing has been affirmed on appeal. *Kreizenbeck v. Sec'y of Health & Hum. Servs.*, 945 F.3d 1362, 1366 (Fed. Cir. 2020); *see also Hooker v. Sec'y of Health & Hum. Servs.*, No. 02-472V, 2016 WL 3456435, at *21 n.19 (Fed. Cl. Spec. Mstr. May 19, 2016) (citing numerous cases where special masters decided case on the papers in lieu of hearing and that decision was upheld). I am simply not required to hold a hearing in every matter, no matter the preferences of the parties. *Hovey v. Sec'y of Health & Hum. Servs.*, 38 Fed. Cl. 397, 402–03 (1997) (determining that special master acted within his discretion in denying evidentiary hearing); *Burns*, 3 F.3d at 417; *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 71500, at *2 (Fed. Cl. Spec. Mstr. Apr. 19, 1991).

## ANALYSIS

## I.    Overview of Alleged Injury

It remains unclear what injury Petitioner most likely suffered. She does not attempt to establish the sole possibly-relevant Table injury: chronic arthritis after receipt of a rubella-containing vaccine. Pet. at 2. And Petitioner's primary causation expert agreed that she did not experience post-vaccination serum sickness. *See, e.g.*, Second Raman Rep. at 1. Rather, Petitioner characterizes her injury as an "inflammatory polyarthropathy"—a broad category that (as she

states) "includes [RA], spondyloarthritis (SpA) and psoriatic arthritis (PsA)." Br. at 19. But she also notes that Dr. Eudy diagnosed her with seronegative RA. *Id.* at 21–22 (citing First Eudy Rep. at 3).[12]

Program law counsels that determining what injury/diagnosis has the most evidentiary support can aid in analyzing a claimant's success in establishing causation (especially when the proposed theory is dependent on proof of a specific kind of injury). *Broekelschen*, 618 F.3d at 1349. Accordingly, I begin with a review of a variety of possible relevant injuries—not only based on what Petitioner is seeking to prove, but what the record best supports.

First, I find that the record does not support a diagnosis of "classic" RA. RA is a chronic, inflammatory autoimmune condition impacting the joints, and resulting in loss of cartilage and bone. J. O'Dell et al., *Rheumatoid Arthritis: Introduction,* in *Current Diagnosis & Treatment in Rheumatology* 139, 139 (John B. Imboden et al., eds. 3d 2012), filed as Ex. A-11 (ECF No. 23-12) ("O'Dell"), at 1. It often has an insidious course, and can be preclinical for a lengthy period of time. O'Dell at 2. Although morning stiffness is a hallmark, RA typically presents with joint swelling (usually first in the hands), coupled with pain. *Id.* at 2, 4–5. RA's cause is unknown, but in most cases, it is believed to be propagated by different kinds of autoantibodies (rheumatoid factor, antinuclear antibodies, or anti-cyclic citrullinated peptide antibodies). *Id.* at 12. RA's diagnosis requires a mix of clinical evidence coupled with lab work (e.g., blood testing revealing the presence of associated autoantibodies or inflammation biomarkers). *Id.* at 13–14. RA has not been thought to present initially with a rash or related skin issues.

Admittedly, one treater, Dr. Eudy, has opined somewhat in favor of an RA diagnosis (although he characterizes it as "seronegative" at best). Second Eudy Rep. at 2. But other specialists who saw Petitioner, including rheumatologist Dr. Tran, doubted her overall presentation was consistent with RA. Ex. 8 at 129, 131, 133. And the medical records do not adequately corroborate this diagnosis, given the absence of antibody/biomarker confirmatory evidence (although admittedly that only diminishes the likelihood of seropositive RA), and the fact that Petitioner's overall course does not establish the existence of chronic inflammation or other RA hallmarks (in particular, persistent evidence of joint swelling/pain), while orthopedic-in-nature concerns that would not reasonably by deemed to reflect RA may better explain her complaints.

Of course, a finding that Petitioner did likely suffer from some form of RA (seronegative or not) would not aid Petitioner—since most recent decisions on the subject *have not found that any covered vaccines can cause RA. See, e.g., Hock v. Sec'y of Health & Hum. Servs.*, No. 17-168V, 2020 WL 6392770, at *23 (Fed. Cl. Spec. Mstr. Sept. 30, 2020) (flu vaccine not causal of

---

[12] Although earlier in the case's history Petitioner additionally proposed Sjogren's disease as a vaccine injury she experienced, Petitioner no longer appears to address it in her briefing (although her treatment for dry eyes is mentioned). And I deem Dr. Raman to have conceded the non-applicability of this injury to Dr. Matloubian. Second Raman Rep. at 3. I thus do not discuss this possible injury further.

RA), (*citing Tullio v. Sec'y of Health & Human Servs.,* No. 15-51V, 2019, WL 7580149 (Fed. Cl. Spec. Mstr. Dec. 19, 2019) (flu vaccine did not cause development of RA), *aff'd,* 2020 WL 4593161, slip op. (Fed. Cir. 2020); *C.P. v. Sec'y of Health & Human Servs.,* No. 14-917V, WL 5483621 (Fed. Cl. Spec. Mstr. August 21, 2019) (flu vaccine did not cause development of polymyalgia and/or RA*); Parker v. Sec'y of Health & Human Servs.,* No. 14-979V, 2019 WL 3425297 (Fed. Cl. Spec. Mstr. June 24, 2019) (flu vaccine did not cause development of RA and polyarticular inflammation); *Moran v. Sec'y of Health & Hum. Servs.,* No. 16-538V, slip op. (Fed. Cl. Spec. Mstr. Oct. 4, 2021) (denying entitlement for a petitioner asserting the flu vaccine caused him to develop symptoms of RA after three days); *Monzon v. Sec'y of Health & Hum. Servs.*, No. 17-1055V, 2021 WL 2711289 (Fed. Cl. Spec. Mstr. June 2, 2021) (denying entitlement to a petitioner alleging Tdap vaccine caused her to develop RA after 10 days); *Suliman v. Sec'y of Health & Hum. Servs.,* No. 13-993V, 2018 WL 6803697 (Fed. Cl. Spec. Mstr. Nov. 27, 2018) (dismissing petition and denying entitlement for claim alleging the Tdap vaccine caused Petitioner to develop polymyalgia rheumatica and/or myositis); *Bean-Sasser v. Sec'y of Health & Hum. Servs.,* No. 13-326V, 2016 WL 1649355 (Fed. Cl. Spec. Mstr. April 5, 2016) (denying entitlement to a petitioner alleging the hepatitis B vaccine caused her to manifest symptoms of RA approximately 11 hours later). Claims of vaccine-caused seronegative RA have fared the same. *McGuinness v. Sec'y of Health & Hum. Servs.,* No. 17-0954V, 2021 WL 5292343 (Fed. Cl. Spec. Mstr. Oct. 20, 2021) (pneumococcal vaccine not causal of seronegative RA).

Second, the record does not support a diagnosis of reactive arthritis. As I noted in *Hock,* 2020 WL 6392770, at *25,

> Reactive arthritis is also a recognized arthritic syndrome, somewhat distinguishable from seropositive RA, and it also has been the subject of prior Program claims. *See, e.g., Wyatt v. Sec'y of Health & Human Servs.,* 144 Fed. Cl. 531 (Fed. Cir. 2019); *Campbell v. Sec'y of Health & Human Servs.,* 90 Fed. Cl. 369 (Fed. Cir. 2009). Reactive arthritis is joint pain and swelling triggered by an infection in another part of the body. *Olson,* 2017 WL 3624085, at *n5. (internal quotation marks and citation omitted). Reactive Reiter's syndrome is a type of reactive arthritis where an autoimmune reaction, usually to bacterial infection, occurs. *Dorland's* at 1816; *Gearin v. Sec'y of Health & Human Servs.,* No. 07-0737V, 2008 WL 2009736, at *1–2 (Fed. Cl. Spec. Mstr. January 31, 2008). Some authorities now consider this symptom complex to be more appropriately classified as reactive arthritis and not distinguished or named separately, however. *Id.* Men are most affected by reactive arthritis and it is usually short-lived.

*Dorland's* at 154, 1816.

Reactive arthritis is typically not chronic, but instead reflects a transient reaction to (usually) an infectious stimulus. *Hock,* 2020 WL 6392770, at *25. It actually could resolve too soon in time post-vaccination even to meet the Act's six-month "severity requirement." *See, e.g.,* *Wyatt v. Sec'y of Health & Hum. Servs.,* 144 Fed. Cl. 531, 537–38 (2019) (Petitioner could not identify clear post-vaccination injury that was actionable; record supported diagnosis of reactive arthritis but it resolved within four months of vaccination and subsequent onset), *aff'd,* 825 F. App'x 880 (Fed. Cir. 2020). Reactive arthritis would also be more likely mediated by an inflammatory T cell response rather than through vaccine-induced autoantibodies. *Casazza v. Sec'y of Health & Hum. Servs.,* No. 17-947V, 2023 WL 6214984, at *17 (Fed. Cl. Spec. Mstr. Aug. 20, 2023).

It is the case that some of Petitioner's treaters proposed reactive arthritis as her injury, at least in treatment encounters that occurred closer-in-time to vaccination. But the evidence does not preponderate in favor of this diagnostic descriptor to characterize her illness. Rather, she reported an immediate, post-vaccination combination of rash and itching, followed several weeks later by headache and some purported joint pain (plus swelling that was never completely confirmed in a clinical setting), and then by back pain radiating to her foot. Joint pain and swelling was also not consistently reported or observed, and inflammation was not detected in testing performed in January or March 2019 (with even Dr. Eudy agreeing that serology testing was negative). Ex. 48 at 12. This combination of factors and evidence does not support reactive arthritis as the best characterization for Petitioner's presentation between the date of vaccination in October 2018 through the spring of 2019.

The record *does*, however, support the conclusion that Petitioner likely experienced an *immediate,* post-vaccination reaction to at least the MMR vaccine. Two days post-vaccination, she experienced a rash and itching, seeking emergency care for it. Ex. 4 at 140, 146. The timing of the documented symptoms is consistent with a vaccine-associated event, and it is supported by Dr. Matloubian's assessment. First Matloubian Rep. at 18–19, 20–21. In addition, it is clear from the record that Petitioner subsequently (albeit over a longer timeframe that is inconsistent in its progression) experienced some polyarthritic complaints—although it is not at all clear that they were in fact inflammatory (as opposed to attributable to degenerative/orthopedic issues). These concerns included headaches, some ankle edema, back and leg pain (often deemed attributable to a degenerative condition), and dry eye concerns). This raises the question of whether any immediate vaccine reaction could be linked to what came thereafter.

## II.    Petitioner Has Not Carried Her Burden of Proof

### A.    *Petitioner's Vaccine Reaction Does not Meet the Act's Severity Requirement*

While the record in this case preponderantly establishes that Ms. Aultman likely experienced a direct reaction to the MMR vaccine, that "injury" alone would not be a basis for a Program claim, since it likely subsided well within the six-month period required to prove injury severity.

A Vaccine Program petitioner carries the burden of establishing the matters required in the petition by a preponderance of the evidence. Section 13(a)(1)(A). One such requirement is "documentation demonstrating severity[13]—generally, that the petitioner "suffered the residual effects or complications of such [vaccine-related] illness, disability, injury, or condition for more than 6 months after the administration of the vaccine." Section 11(c)(1)(D)(i); *see also Black v. Sec'y of Health & Human Servs.*, 33 Fed. Cl. 546, 550 (1995) (reasoning that the "potential petitioner" must not only make a prima facie case, but clear a jurisdictional threshold, by "submitting supporting documentation which reasonably demonstrates that a special master has jurisdiction to hear the merits of the case"), *aff'd*, 93 F.3d 781 (Fed. Cir. 1996) (internal citations omitted). Cases are dismissed on the basis of severity, even when a vaccine-caused injury is indisputably established. *Williams v. Sec'y of Health & Hum. Servs.*, No. 20-1120V, slip. op. at 4, 5 (Fed. Cl. Spec. Mstr. Mar. 31, 2025).

The record does preponderantly support the conclusion that Ms. Aultman experienced some kind of vaccine reaction within two days. And Dr. Matloubian has allowed for this possibility as well. But the same record suggests resolution of the reaction (which mostly presented as a rash) by the fall of 2018. *See, e.g.*, Ex. 4 at 166–68 (October 2018 treatment); Ex. 5 at 13–14 (November 2018 treatment); Ex. 8 at 129, 131 (rheumatology treatment in March 2019). Thus, this reaction *by itself* was self-limiting, and alone it cannot be the basis for a Program award. Rather, Petitioner must demonstrate that her subsequent symptoms (which again she identifies as an inflammatory polyarthropathy) were the end-result of this initial reaction.

---

[13] Congress has stated that the severity requirement was designed "to limit the availability of the compensation system to those individuals who are seriously injured from taking a vaccine." H.R. REP. 100-391(I), at 699 (1987), reprinted in 1987 U.S.C.C.A.N. 2313–1, 2313–373, cited in *Cloer v. Sec'y of Health & Human Servs.*, 654 F.3d 1322, 1335 (Fed. Cir. 2011), *cert. denied*, 132 S.Ct. 1908 (2012); *Wright v. Sec'y of Health & Human Servs.*, 22 F.4th 999, 1002 (Fed. Cir. 2022).

B.    *Petitioner's Transient Vaccine Reaction Could Not Also Cause a Subsequent Inflammatory Polyarthropathy*

At the outset, it should be noted that Petitioner's legal contentions regarding the nature of her *Althen* prong one burden of proof (other than the fact that she does not have the obligation to prove to a degree of scientific certainty that the vaccines at issue can cause injury) are incorrect. As noted above in the section of this Decision discussing the legal standards applicable to the case, the Federal Circuit has clearly embraced *preponderance* as the applicable evidentiary standard. *See, e.g.*, *Kalajdzic*, 2024 WL 3064398, at *2; *Boatmon*, 941 F.3d at 1359. Petitioner protests that any objections to the theory her expert proposes hides a demand for certainty. Br. at 15, 25. But offering enough evidence to suggest vaccine causation is *plausible* does not equate to a preponderant showing that "more likely than not" a vaccine "can cause" a particular injury—as the Circuit itself has recognized. *See, e.g.*, *Sheller v. Sec'y of Health & Hum. Servs.*, 121 F.4th 1301, 1308 (Fed. Cir. 2024) (noting that "[a] plausible theory . . . resides somewhat lower than the preponderant evidence standard required to prove entitlement to compensation") (*citation omitted*).

In *Boatmon,* the Federal Circuit could not have been clearer in explaining itself on this point:

> We have consistently rejected theories that the vaccine only "likely caused" the injury and reiterated that a "plausible" or "possible" causal theory does not satisfy the standard. *Moberly*, 592 F.3d at 1322 (rejecting a "more relaxed standard" of whether the condition was "likely caused" by the vaccine and reiterating that "proof of a 'plausible' or 'possible' causal link between the vaccine and the injury ... is not the statutory standard"); *see also LaLonde*, 746 F.3d at 1339 ("However, in the past we have made clear that simply identifying a 'plausible' theory of causation is insufficient for a petitioner to meet her burden of proof." (quoting *Moberly*, 592 F.3d at 1322)).

*Boatmon,* 941 F.3d at 1360.

Accordingly, it is reasonable to evaluate whether the causation theory presented has been supported with sufficient reliable scientific and medical proof to conclude that the flu or MMR vaccines "more likely than not" can cause an inflammatory polyarthropathy, manifesting as (or even independently of) her demonstrated, transient vaccine reaction.

That standard has not in this case been met. Dr. Raman was Petitioner's primary causation expert, but his theory lacked sufficient reliable pillars to find that it has satisfied the preponderant

test. Dr. Raman did demonstrate that the concept of trained immunity has a reliable scientific basis (although there is arguably more evidence establishing its *beneficial* aspects than in demonstrating that it can become pathogenic). But his report and the associated literature he has offered did not provide sufficient evidence linking the vaccines at issue or their viral cognates with arthritic-like symptoms mediated by virtue of an initial triggering of the innate immune system that "mis-trains" it into a pathologic response. He also did not establish with sufficient reliable medical or scientific evidence that a nonspecific kind of vaccine reaction, otherwise expected to be transient, could mutate into a longer-term, pathogenic reaction ultimately manifesting in the form of symptoms Petitioner experienced. In fact, his theory is somewhat inconsistent with how trained immunity is even thought to unfold—for, as Dr. MacGinnitie established, the second immune system exposure after the initial, "training" exposure to the vaccination had not been in this case shown to exist or established. Second MacGinnitie Rep. at 1.

Otherwise, Dr. Raman's theory[14] relied on generalities about autoimmune conditions, or speculation about how an initial reaction could promote subsequent pathologic harm. And these aspects of his theory were not in turn bulwarked with studies, or even case reports (already a fairly weak kind of evidence), suggesting that receipt of the flu or MMR vaccine would initiate a disease process comparable to what Petitioner experienced—or in the manner proposed. The first *Althen* prong was not satisfied.

C.    *Petitioner Has Not Demonstrated Her Vaccine Reaction Did Cause Her Subsequent Symptoms*

Just as Petitioner has not established that a transient MMR vaccine reaction, manifesting with rash or other allergic-like responses, "can cause" a subsequent inflammatory polyarthropathy, she did not preponderantly show, via Drs. Raman's or Eudy's reports, that any of her symptoms represent sequelae of the reaction, or part of the progression of the reaction into something resembling an inflammatory polyarthropathy.

As already noted, the medical record preponderantly establishes that Petitioner likely experienced some kind of post-vaccination reaction, primarily manifesting as a rash. But she herself considered it mostly resolved by the second half of October 2018. Ex. 4 at 166–68, 171. She later that fall began complaining of distinguishable problems—mainly back/hip pain that was thought to reflect bursitis or a radiculopathy. Ex. 34 at 201, 204. She thereafter in 2019 received orthopedic treatment for these issues—and exploration of possible neurologic or even rheumatologic explanations for her symptoms were largely inconclusive (if not negative). *See, e.g.*, Ex. 8 at 83–84, 96–98, 103, 129–33. And there was never any testing confirmation that Petitioner

---

[14] Dr. Raman acted as Petitioner's primary expert on causation, and I therefore give his opinion on the subject greater consideration than the conclusory statements made by Dr. Eudy about the capacity of either relevant vaccine to cause Petitioner's unspecified polyarthropathy.

was experiencing some kind of underlying persistent inflammation, or possessed any biomarkers for some kind of autoimmune condition either.

This record is not consistent with the theory that an initial vaccine reaction propagated other, different, symptoms via immune training. Rather, it allows for no way at all to conclude that one event progressed to what followed—unless I rely on the kind of *post hoc ergo propter hoc* reasoning that is rejected in the Vaccine Program. *See Galindo v. Sec'y of Health & Hum. Servs.*, No. 16-203V, 2019 WL 2419552, at *20 (Fed. Cl. Spec. Mstr. May 14, 2019) (citing *U.S. Steel Group v. United* States, 96 F.3d 1352, 1358 (Fed. Cir. 1996) ("[b]ut to claim that the temporal link between these events proves that they are causally related is simply to repeat the ancient fallacy: *post hoc ergo propter hoc*").

Dr. Eudy's report, and associated diagnosis, does not ameliorate these evidentiary deficiencies. It is of course generally the case that a special master is not bound by a treater's view, but may evaluate/weigh such an opinion, like any other evidence. *Snyder*, 88 Fed. Cl. at 746 n.67. And here, there are sound reasons to give his view limited weight. For one thing, Dr. Eudy seemed to embrace diagnoses that the record, or other experts, rejected, like a hypersensitivity reaction or reactive arthritis. He also proposed Petitioner had experienced some kind of seronegative RA—a diagnosis that not only lacks record support, but which would not be a persuasive basis for a vaccine injury award, given the extent RA has been rejected consistently as a vaccine-associated injury. Further, Dr. Eudy's opinions about the autoimmune nature of Petitioner's injury were not shared by Dr. Tran, another rheumatologist who saw her around the same time. And Dr. Eudy saw Petitioner over *six months after* vaccination, further diminishing the evidentiary value of any causation opinions he offers herein based on her condition and course from the prior fall.

## III.   This Matter Was Reasonably Resolved Without a Hearing

In ruling on the record, I am choosing not to hold a hearing—over Petitioner's objections. Determining how best to resolve a case is a matter that lies generally within my discretion, but I shall explain why I determined that a hearing was unnecessary.

Prior decisions have recognized that a special master's discretion in deciding whether to conduct an evidentiary hearing "is tempered by Vaccine Rule 3(b)," or the duty to "afford[] each party a full and fair opportunity to present its case." *Hovey*, 38 Fed. Cl. at 400–01 (citing Rule 3(b)). But that rule also includes the obligation of creation of a record "sufficient to allow review of the special master's decision." *Id*. Thus, the fact that a claim is legitimately disputed, such that the special master must exercise his intellectual faculties in order to decide a matter, is not itself grounds for a trial (for if it were, trials would be required in every disputed case). Special masters are expressly empowered to resolve fact disputes without a hearing—although they should only so act if a party has been given the proper "full and fair" chance to prove their claim.

It was wholly fair to both sides to resolve this case on the papers and after briefing by the parties. The matter has been pending for nearly four years, and in that time, Petitioner refined her contentions in conformance to the proof adduced about the likely nature of her injury. She was permitted to obtain expert input, and also offered a treater opinion as well. But the theory presented was ultimately quite thin, and not so complex that live testimony was needed to parse it. Rather, the existing record—including medical records, written reports, and briefs—was sufficient grounds for resolving the case. The claim was thus properly resolved without a hearing, which was not needed for me to understand its contours, and which would only have further delayed the matter's resolution.

## CONCLUSION

Petitioner has not carried her burden of proof, and therefore she is not entitled to compensation for her alleged injury. In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court **SHALL ENTER JUDGMENT** in accordance with the terms of this Decision.[15]

**IT IS SO ORDERED.**

/s/ Brian H. Corcoran
Brian H. Corcoran
Chief Special Master

---

[15] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment if (jointly or separately) they file notices renouncing their right to seek review.